IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ROBERT KLEIN ENGLER and DR. GENE A. REISINGER, | ) ) ) | |
| | ) | No. 08 CV 3696 |
| Plaintiffs, | ) ) | |
| | ) | Honorable Milton I. Shadur |
| v. | ) ) | |
| VILLAGE OF OAK PARK, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF CLAIM THAT THE SECOND
AMENDMENT IS INCORPORATED INTO THE FOURTEENTH
AMENDMENT SO AS TO BE APPLICABLE TO STATES AND LOCALITIES**

      Plaintiffs, National Rifle Association of America, Inc., Robert Klein Engler, and Dr. Gene A. Reisinger, by and through their attorneys, Freeborn & Peters LLP and Stephen P. Halbrook, pursuant to this Court's order entered October 29, 2008, respectfully file this memorandum in support of their claim that the Second Amendment is incorporated into the Fourteenth Amendment so as to be applicable to states and localities, and in support hereof state as follows:

## INTRODUCTION

      The Village of Oak Park makes it unlawful for any person to possess a "firearm," which it defines as a handgun. Oak Park Municipal Code, §§ 27-2-1, 27-1-1. Count One of the Complaint alleges that this infringes on the right of the people to keep and bear arms as guaranteed by the Second Amendment to the U.S. Constitution, which is incorporated into the Fourteenth Amendment and is thus applicable to states and localities. Oak Park denies that allegation and asserts that the complaint fails to state a claim on which relief can be granted. Answer ¶ 25 & Defense.

      To expedite the disposition of this action, the Court should in the first instance decide the threshold legal issue of whether the Second Amendment applies to Oak Park's ordinance by incorporation into the Fourteenth Amendment. If the Fourteenth Amendment incorporates the Second Amendment, then Oak Park's prohibition is void as a matter of law.

As the following demonstrates, the Second Amendment applies to the states through the Fourteenth Amendment. *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), held the District of Columbia's prohibition on possession of handguns infringes on the Second Amendment right of the people to keep and bear arms. While incorporation was not an issue, the Court suggests that the Second Amendment is incorporated in the Fourteenth Amendment. First, *Heller* suggests that the right to have arms is a fundamental right, in that "the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right". *Id.* at 2797. Second, it notes that nineteenth-century decisions that the Second Amendment does not apply to the states "did not engage in the sort of Fourteenth Amendment inquiry required by our later cases." *Id.* at 2813 n.23.

*Heller* directly contradicts a Seventh Circuit decision that relied on the same nineteenth-century decisions to hold that the Second Amendment is not incorporated into the Fourteenth Amendment and therefore does not prohibit local firearms bans. *See Quilici v. Village of Morton Grove*, 695 F.2d 261, 270 (7th Cir. 1982), *cert. denied*, 464 U.S. 863 (1983). Contrary to *Quilici*, the Supreme Court clarifies in *Heller* that it has left open whether the Second Amendment is incorporated into the Fourteenth Amendment, and strongly suggests that it is. *Quilici* therefore no longer applies on the issue of incorporation. Instead, applying the "Fourteenth Amendment inquiry required by [the Supreme Court's] later cases," the right to keep and bear arms must be held applicable to the states.

## ARGUMENT

### I.  The Right To Keep And Bear Arms Is A Fundamental, Personal Right Explicitly Guaranteed By The Constitution.

*Heller* recognizes the right to keep and bear arms as an explicitly-guaranteed right in the same category as other fundamental rights. "By the time of the founding, the right to have arms had become fundamental for English subjects." *Heller*, 128 S. Ct. at 2798. Blackstone "cited the arms provision of the [English] Bill of Rights as one of the fundamental rights of Englishmen. . . . It was, he said, 'the natural right of resistance and self-preservation,' . . . and 'the right of having and using arms for self-preservation and defense. . . .'" *Id.* (citations omitted).

"[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Id.* at 2797. Thus, "[t]his is not a right granted

by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *Id.* at 2797 (quoting *United States v. Cruikshank*, 92 U. S. 542, 553 (1876)).[1]

As with other fundamental rights, the explicit nature of "the right of the people" to keep and bear arms precludes application of the rational-basis standard of review. As *Heller* states:

> Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms. *See United States v. Carolene Products Co.,* 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) ("There may be narrower scope for operation of the presumption of constitutionality [i.e., narrower than that provided by rational-basis review] when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments . . .").

*Id.* at 2818 n.27.

*Heller* rejects Justice Breyer's proposed "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id.* at 2821. Such a test would allow "arguments for and against gun control" and the upholding of a handgun ban "because handgun violence is a problem, [and] because the law is limited to an urban area. . . ."[2] *Id. Heller* responds:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government -- even the Third Branch of Government -- the power to decide on a case-by-case basis whether the right is really worth insisting upon. . . . Like the First, it [the Second Amendment] is the very product of an interest-balancing by the people. . . . And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Id.*

The fundamental character of the right to keep and bear arms, and why that right precludes a handgun ban, is tied to the protection of life. *Heller* explains:

> the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is

---

[1] *Cruikshank* made the same point about the First Amendment: "The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States. . . . It was not, therefore, a right granted to the people by the Constitution." 92 U.S. at 551-52.

[2] Defendant's discovery requests in this case primarily seek information that would be relevant only if this "interest-balancing inquiry" was permissible. It is not.

> overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," . . . would fail constitutional muster.

*Id.* at 2817-18.

In sum, the Second Amendment protects the fundamental right to keep and bear arms, including the possession of handguns in the home for lawful purposes. As with other constitutional rights, regulation of this right is subject to heightened scrutiny.

**II.    The Fourteenth Amendment Was Intended To Protect The Right To Keep And Bear Arms From State Prohibition.**

*Heller* noted conflicting views in the antebellum era about whether the Bill of Rights applied to the states. Some state supreme courts and commentators opined that the Second Amendment applied directly to the states. *Id.* at 2808-09. *Barron v. Mayor of Baltimore*, 7 Pet. 243, 8 L.Ed. 672 (1833), resolved that the Bill of Rights did not apply directly to the states. However, the Fourteenth Amendment was intended to overturn *Barron*.[3]

*Heller* explains the intent of the Reconstruction Congress to protect the right of freed slaves to keep and bear arms from state infringement by its proposal of the Fourteenth Amendment and passage of civil rights legislation. "In the aftermath of the Civil War, there was an outpouring of discussion of the Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves."[4] As the Court notes, "Blacks were routinely disarmed by Southern States after the Civil War. Those who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms."[5]

---

[3] "Representative [John] Bingham . . . explained that he had drafted § 1 of the Fourteenth Amendment with the case of *Barron v. Mayor of Baltimore*, 7 Pet. 243 (1833), especially in mind." *Monell v. Dep't of Social Services*, 436 U.S. 658,686-87 (1978). On the same page of that speech, Bingham characterized "the right of the people to keep and bear arms" as one of the "limitations upon the power of the States . . . made so by the Fourteenth Amendment." Cong. Globe, 42nd Cong., 1st Sess., App. 84 (Mar. 31, 1871).

[4] *Heller*, 128 S. Ct. at 2809-10, citing S. Halbrook, Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876 (1998). This book includes an exhaustive study of the original intent that the Fourteenth Amendment incorporates the Second Amendment.

[5] *Id.* at 2810. *Heller* quotes the following 1866 documents: Report of the Commission of the Freedmen's Bureau (Kentucky seized arms from blacks; "Thus, the right of the people to keep and bear arms as provided in the Constitution is infringed."); Joint Committee on Reconstruction (firearms seized from freedmen in South Carolina, "in clear and direct violation of their personal rights as guaranteed by the Constitution of the United States, which declares that 'the right of the people to keep and bear arms shall not be infringed.'");

*Heller* quotes the following from the Freedmen's Bureau Act of 1866: "[T]he right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens . . . without respect to race or color, or previous condition of slavery. . . ."[6] The Act was passed by over two-thirds vote of the same Congress that proposed the Fourteenth Amendment,[7] and sought to guarantee the same rights.[8]

The Fourteenth Amendment protects from state infringement the "indefeasible right of personal security, personal liberty and private property." *Griswold v. Connecticut,* 381 U.S. 479, 485 n.* (1965).[9] As noted above, the Freedmen's Bureau Act listed "the constitutional right to bear arms" as included in the rights to "personal liberty, personal security, and . . . estate." *Heller*, 128 S. Ct. at 2810.

*Heller* noted that "Similar discussion attended the passage of the Civil Rights Act of 1871 and the Fourteenth Amendment." 128 S. Ct. at 2810. "With respect to the proposed Amendment, Senator Pomeroy described as one of the three 'indispensable' 'safeguards of liberty . . . under the

---

*The Loyal Georgian* (Augusta) ("[a]ll men, without distinction of color, have the right to keep and bear arms to defend their homes, families or themselves.").

  *See also Bell v. Maryland*, 378 U.S. 226,247-48 & n.3 (1964) (Douglas, J., concurring) (Fourteenth Amendment intended to eradicate the black codes, under which "Negroes were not allowed to bear arms."); *Silveira v. Lockyer*, 328 F.3d 567,577 (9th Cir. 2003) (Kleinfeld, C.J., joined by C.J.s Kozinski, O'Scannlain, & T.G. Nelson, dissenting from denial of rehearing en banc) ("The 'Black Codes' often contained restrictions on firearm ownership and possession. . . . A substantial part of the debate in Congress on the Fourteenth Amendment was its necessity to enable blacks to protect themselves from White terrorism and tyranny in the South.").

[6] *Id.* at 2810 (quoting 14 Stat. 176-177 (1866)). *Heller* added:

> The understanding that the Second Amendment gave freed blacks the right to keep and bear arms was reflected in congressional discussion of the bill, with even an opponent of it saying that the founding generation "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense." Cong. Globe, 39th Cong., 1st Sess., 362, 371 (1866) (Sen. Davis).

[7] Cong. Globe, 39th Cong., 1st Sess. 3842, 3850 (July 16, 1866).

[8] *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 423-24, 436 (1968); *Regents of University of California v. Bakke*, 438 U.S. 265, 397-98 (1978) (Marshall, J.).

[9] "[T]he right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." *Estate of Porter by Nelson v. Illinois*, 36 F.3d 684, 688 (7th Cir. 1994). "Although it would be impossible to catalogue and to describe precisely each 'liberty' interest protected by the Due Process Clause, it can hardly be doubted that chief among them is the right to some degree of bodily integrity." *White v. Rochford,* 592 F.2d 381, 383 (7th Cir. 1979).

Constitution' a man's 'right to bear arms for the defense of himself and family and his homestead.'"[10] The Court quoted similar material on the origins of the Civil Rights Act.[11]

*Heller* concluded: "It was plainly the understanding in the post-Civil War Congress that the Second Amendment protected an individual right to use arms for self-defense." *Id.* at 2811. It was further the understanding that this right would be protected from state violation by the Fourteenth Amendment.

### III. Nineteenth-Century Precedents Held that the Bill Of Rights Does Not Apply Directly to the States, But Did Not Decide Whether Such Guarantees Are Incorporated Into the Fourteenth Amendment.

#### A. *Cruikshank, Presser,* and *Miller* "Did Not Engage in the Sort of Fourteenth Amendment Inquiry Required by Our Later Cases"

*Heller* clarifies that the Court has never decided whether the Second Amendment applies to the states through the Fourteenth Amendment, but strongly suggests that it does. A trio of nineteenth-century precedents held that the First, Second, and Fourth Amendments do not apply to the states directly, but did not consider whether the rights therein are incorporated into the Fourteenth Amendment so as to prohibit violation of such rights by the states.

*United States v. Cruikshank,* 92 U.S. 542, 553 (1876), "in the course of vacating the convictions of members of a white mob for depriving blacks of their right to keep and bear arms, held that the Second Amendment does not by its own force apply to anyone other than the Federal Government." *Heller,* 128 S. Ct. at 2812. It stated about the Second Amendment right of "bearing arms for a lawful purpose" that "the people [must] look for their protection against any violation by their fellow-citizens of the rights it recognizes" to the States' police power. *Id.* at 2812-13 (quoting *Cruikshank,* 92 U. S. at 553).

*Heller* commented: "With respect to *Cruikshank's* continuing validity on incorporation, a question not presented by this case, we note that *Cruikshank* also said that the First Amendment did not apply against the States and did not engage in the sort of Fourteenth Amendment inquiry required by our later cases." *Id.* at 2813 n.23. *Heller* added that two subsequent decisions

---

[10] *Id.* at 2810-11 (citing Cong. Globe, 39th Cong., 1st Sess., 1182 (1866)).
[11] *Id.* at 2810-11 (quoting Rep. Butler on the intent "to enforce the well-known constitutional provision guaranteeing the right of the citizen to 'keep and bear arms.'").

"reaffirmed that the Second Amendment applies only to the Federal Government." *Id.* (citing *Presser v. Illinois*, 116 U. S. 252, 265 (1886), and *Miller v. Texas*, 153 U.S. 535, 538 (1894)) .

*Heller* quoted *Presser* as having held that forbidding military organizations or armed parades in cities without authorization did not violate the right to bear arms, concluding: "*Presser* said nothing about the Second Amendment's meaning or scope, beyond the fact that it does not prevent the prohibition of private paramilitary organizations." *Id.* at 2813.

More specifically, *Presser* held that a prohibition on unlicensed armed marches in cities "do[es] not infringe the right of the people to keep and bear arms," adding that the Second Amendment did not, in and of itself, limit state action.[12]  116 U.S. at 265.  *Presser* made no mention of the Fourteenth Amendment in this discussion.

*Presser* next considered whether the ban on unlicensed armed parades violated the privileges-or-immunities clause of the Fourteenth Amendment, given that the First Amendment protected the right to assemble to petition for a redress of grievances.  Since armed marches had no such purpose, and the states were entitled to suppress armed mobs, the Court rejected any such First Amendment right. *Id.* at 266-68.

Finally, *Presser* found the argument that the act "deprives him of either life, liberty, or property without due process of law . . . is so clearly untenable as to require no discussion." *Id.* at 268.  As *Heller* notes, this Fourteenth Amendment due process claim was unrelated to the claim concerning the right to keep and bear arms. *Heller*, 128 S. Ct. at 2813.[13]

*Miller v. Texas*, *supra*, agreed that the Second and Fourth Amendments did not apply directly to the states, and refused to consider whether these provisions applied to the states through the Fourteenth Amendment. *Miller*, 153 U.S. 535, 538.  Specifically, "it is well settled that the restrictions of these [Second and Fourth] amendments operate only upon the federal power, and have no reference whatever to proceedings in state courts." *Id.* at 538.  *Miller* explicitly stated that it was not deciding whether the Fourteenth Amendment protects Second and Fourth Amendment rights: "If the Fourteenth Amendment limited the power of the States as to such rights [to bear arms and against warrantless searches] as pertaining to citizens of the United States, we think it was

---

[12] "But a conclusive answer to the contention that *this amendment* [the Second] prohibits the legislation in question lies in the fact that *the amendment* is a limitation only upon the power of congress and the national government, and not upon that of the state." 116 U.S. at 265 (emphasis added).
[13] Presser's brief did not raise the issue of whether the Fourteenth Amendment protects the individual right to keep and bear arms. S. Morrison, "Does the Fourteenth Amendment Incorporate the Bill of Rights?" 2 Stanford L. Rev. 140, 147 (1949).

fatal to this claim that it was not set up in the trial court. . . . [A] privilege or immunity under the constitution of the United States cannot be set up here . . . when suggested for the first time in a petition for rehearing after judgment."[14]

    *Miller* clarifies that the Court did not, in that case or in *Cruikshank* and *Presser*, consider whether the Second Amendment is incorporated into the Fourteenth. To the contrary, that trio of cases decided only that the First, Second, and Fourth Amendments did not apply directly to the states. Had the preceding cases rejected incorporation, *Miller* would have said so; instead, it refused to consider the issue. And *Miller* refused to consider incorporation under the privileges-or-immunities clause of the Fourteenth Amendment -- analysis under the due process clause of the Fourteenth Amendment would not occur until years later.

    No wonder, as *Heller* comments, that such cases as *Cruikshank* "did not engage in the sort of Fourteenth Amendment inquiry required by our later cases." 128 S. Ct. at 2813 n.23. It is incumbent on this Court to make such an inquiry.

### B.    *Heller* Supersedes Circuit Precedent Rejecting Incorporation

    "We must, with exceptions not applicable here, decide cases in light of intervening Supreme Court decisions." *Consolidation Coal Co. v. Office of Workers' Comp. Programs*, 54 F.3d 434,437 (7th Cir. 1995). *Heller* undermines adverse Seventh Circuit precedent on the meaning of the Second Amendment and on whether it is incorporated into the Fourteenth Amendment.

    *Heller*'s holding that the Second Amendment guarantees an individual right to keep and bear arms, including handguns, squarely overrules the Seventh Circuit's ruling that "the right to keep and bear handguns is not guaranteed by the second amendment." *Quilici v. Village of Morton Grove*, 695 F.2d 261, 270 (7th Cir. 1982), *cert. denied*, 464 U.S. 863 (1983).

    *Quilici* relied primarily on *Presser* to hold "that the second amendment does not apply to the States . . . ." *Id.* *Presser* did indeed so hold, but *Presser* never considered whether the Second Amendment applies to the states through the Fourteenth Amendment. In misreading *Presser* to

---

[14] *Id.* at 538-39 (citing, *inter alia*, *Spies v. Illinois*, 123 U.S. 131 (1887)). *Spies* reiterated that the Bill of Rights was inapplicable to state action. 123 U.S. at 166. For the first time ever, it was also argued before the Court that the Fourteenth Amendment incorporated the Bill of Rights, thereby prohibiting the States from violating "the privilege of freedom of speech and press – of peaceable assemblages of the people – of keeping and bearing arms--of immunity from search and seizure--immunity from self-accusation, from second trial--and privilege of trial by due process of law." *Id.* at 150-51; *see also* 166-67. *Spies* refused to decide that issue because it was not raised in the trial court. *Id.* at 181. *See* Akhil Reed Amar, "The Bill of Rights and the Fourteenth Amendment," 101 Yale Law Journal 1193, 1259-60, 1270-72 (April 1992).

have resolved the issue, *Quilici* ignored the clarification to the contrary in *Miller v. Texas* that the Second Amendment did not apply directly to the states, but that whether it applied through the Fourteenth Amendment was undecided.

*Quilici* rejected the arguments "that *Presser* is no longer good law or would have been decided differently today." 695 F.2d at 270. While *Presser* remains good law for the limited proposition that the Bill of Rights does not apply *directly* to the states, *Heller* makes clear that it would be decided differently today -- such cases "did not engage in the sort of Fourteenth Amendment inquiry required by our later cases." 128 S. Ct. at 2813 n.23. It is unremarkable that jurisprudence evolves over time and that later cases require new inquiries not known when earlier cases were decided.

*Quilici* fails to cite *Miller v. Texas,* which – consistent with *Cruikshank* and *Presser* – held that the Second and Fourth Amendments did not *directly* apply to the states. 153 U.S. at 538. *Miller* explicitly stated that it was *not* deciding the question of whether the Fourteenth Amendment protects the right to keep and bear arms. *Id.* at 538-39.

*Cruikshank, Presser*, and *Miller* "came well before the Supreme Court began the process of incorporating certain provisions of the first eight amendments into the Due Process Clause of the Fourteenth Amendment, and . . . they ultimately rest on a rationale equally applicable to all those amendments . . . ." *United States v. Emerson*, 270 F.3d 203, 221 n.13 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002) (holding that the Second Amendment protects individual rights).

Similarly noting that *Cruikshank* and *Presser* were "decided before the Supreme Court held that the Bill of Rights is incorporated by the Fourteenth Amendment's Due Process Clause," the Ninth Circuit observed:

> Following the now-rejected *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833) (holding that the Bill of Rights did not apply to the states), *Cruikshank* and *Presser* found that the Second Amendment restricted the activities of the federal government, but not those of the states. One point about which we are in agreement with the Fifth Circuit is that *Cruikshank* and *Presser* rest on a principle that is now thoroughly discredited. *See Emerson*, 270 F.3d at 221 n.13.

*Silveira v. Lockyer*, 312 F.3d 1052, 1067, *reh. denied*, 328 F.3d 567 (9th Cir. 2003), *cert. denied*, 540 U.S. 1046 (2003).[15]

---

[15] We should . . . revisit whether the requirements of the Second Amendment are incorporated into the Due Process Clause of the Fourteenth Amendment." *Nordyke v. King*, 319 F.3d 1185, 1193 & n.3 & 4 (9th Cir. 2003) (Gould, C.J., specially concurring) (discussing literature on incorporation).

Rather than characterizing those old cases as resting on a discredited principle, it suffices to note that they are simply inapplicable. They held only that the Bill of Rights does not apply directly to the states, and did not consider whether the Fourteenth Amendment incorporates those rights. For that, one must look to twentieth-century jurisprudence.

Circuit Judge Coffey's dissenting opinion in *Quilici*, which is now vindicated by *Heller*, sought to apply that jurisprudence as follows:

> The majority cavalierly dismisses the argument that the right to possess commonly owned arms for self-defense and the protection of loved ones is a fundamental right protected by the Constitution. Justice Cardozo in *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 151, 82 L. Ed. 288 (1937), defined fundamental rights as those rights "implicit in the concept of ordered liberty." Surely nothing could be more fundamental to the "concept of ordered liberty" than the basic right of an individual, within the confines of the criminal law, to protect his home and family from unlawful and dangerous intrusions.

*Quilici*, 695 F.2d at 278 (Coffey, C.J., dissenting).[16]

Finally, *Quilici* rejected the normal enquiry into what was "intended by the Framers and made part of the Constitution upon the States' ratification of those of those [Civil War] Amendments . . . ." *Metro. Hous. Dev. Corp. v. Arlington Heights*, 616 F.2d 1006, 1010 (7th Cir. 1980).[17] *Quilici* stated:

> Appellants devote a portion of their briefs to historical analysis of the development of English common law and the debate surrounding the adoption of the second and fourteenth amendments. This analysis has no relevance on the resolution of the

---

[16] Judge Coffey further wrote (*id.* at 280):
> A fundamental part of our concept of ordered liberty is the right to protect one's home and family against dangerous intrusions subject to the criminal law. Morton Grove, acting like the omniscient and paternalistic "Big Brother" in George Orwell's novel, "1984", cannot, in the name of public welfare, dictate to its residents that they may not possess a handgun in the privacy of their home.

[17] "The Court has not hesitated to re-examine past decisions according the Fourteenth Amendment a less central role in the preservation of basic liberties than that which was contemplated by its Framers when they added the Amendment to our constitutional scheme." *Malloy v. Hogan*, 378 U.S. 1,5 (1964). As *Heller* itself states, citing incorporation cases, 128 S. Ct. at 2816:
> We conclude that nothing in our precedents forecloses our adoption of the original understanding of the Second Amendment. It should be unsurprising that such a significant matter has been for so long judicially unresolved. For most of our history, the Bill of Rights was not thought applicable to the States. . . . Other provisions of the Bill of Rights have similarly remained unilluminated for lengthy periods.

controversy before us. Accordingly, we decline to comment on it, other than to note that we do not consider individually owned handguns to be military weapons.

*Quilici,* 695 F.2d at 270 n.8.

Yet a considerable portion of *Heller* is devoted to the same "historical analysis" that *Quilici* rejected. As shown by *Heller*'s discussion of Reconstruction and the intent of the Fourteenth Amendment discussed above, this historical background contradicts *Quilici's* holding against incorporation. 128 S. Ct. at 2809-11. Much more could be added to that discussion. For instance, when Senator Jacob M. Howard introduced the Fourteenth Amendment to the Senate in 1866, he referred to

> the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as . . . the right to keep and bear arms. . . . The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees.

Cong. Globe, 39th Cong., 1st Sess. 2766 (May 23, 1866), *quoted in Duncan v. Louisiana*, 391 U.S. 145, 166-67 (1968) (Black, J., concurring).

Following *Quilici,* the Seventh Circuit in *Sklar v. Byrne,* 727 F.2d 633,637 (7th Cir. 1984), upheld Chicago's handgun ban, stating: "The Chicago handgun ordinance does not impinge upon any federal constitutional right to bear arms." Given that the ordinance "does not impinge upon fundamental rights," *Sklar* upheld it under the rational-basis test in reliance on the legislative finding that "handguns and other firearms play a major role in crimes and accidental deaths and injuries." *Id.* at 639-40. *Sklar* thus applied the very same rational basis and interesting-balancing tests that *Heller* rejected.

In sum, *Heller* squarely overruled the holding in *Quilici* that the Second Amendment does not guarantee an individual right to possess handguns. Further, *Heller* supersedes the holding in *Quilici* that such rights are not incorporated into the Fourteenth Amendment, in that *Quilici* relied on cases that "did not engage in the sort of Fourteenth Amendment inquiry required by our later cases." *Heller,* 128 S. Ct. at 2813 n.23. The following sets forth the inquiry that is required by those later cases.

**IV.    The "Fourteenth Amendment Inquiry Required By Our Later Cases" Mandates Incorporation of the Second Amendment.**

A right is "fundamental" if it is "explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1,

17, 33 (1973). As such, the Second Amendment should be recognized as incorporated into the Fourteenth Amendment.

Beginning in 1897, the Supreme Court has found substantive Bill of Rights guarantees incorporated into the due process clause of the Fourteenth Amendment. The reasoning in these opinions is *a priori*, requiring only a sentence or two. Its basis is that the respective rights have explicit constitutional recognition.

*Heller* referred to "the historical reality that the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors. . . .'" *Id.* at 2801-02 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). *Robertson* referred to "the right of the people to keep and bear arms (article 2)" among other Bill of Rights guarantees as having been incorporated "into the fundamental law." 165 U.S. at 281-82.

Just after the above decision, *Chicago B. & Q. R. Co. v. Chicago,* 166 U.S. 226 (1897), held that the just compensation guarantee of the Fifth Amendment is incorporated into the Fourteenth Amendment's due process clause. The Court referred to "limitations on such power which grow out of the essential nature of all free governments" and "implied reservations of individual rights . . . which are respected by all governments entitled to the name." *Id.* at 237 (citation omitted). It relied on a decision by Justice Jackson as a circuit judge explaining that the Fourteenth Amendment put "limitations and restraints . . . upon their [states'] power in dealing with individual rights. . . ." 166 U.S. at 238-39 (quoting *Scott v. Toledo*, 36 F. 385, 395-96 (C.C. Ohio 1888)).[18]

The First Amendment rights of free speech and press were incorporated into the Fourteenth Amendment in *Gitlow v. New York*, 268 U.S. 652, 666 (1925), in a single sentence: "freedom of speech and of the press . . . are among the fundamental personal rights and 'liberties' protected by the due process clause of the 14th Amendment from impairment by the states."[19]

*De Jonge v. Oregon,* 299 U.S. 353, 364 (1937), recognized the incorporation of the right to assemble into the Fourteenth Amendment as follows:

---

[18] In the paragraph before the above, Judge Jackson explained, 36 F. at 395:
> The first 10 amendments to the constitution recognized and secured to all citizens certain rights, privileges, and immunities essential to their security. . . . So far as the states were concerned, citizens of the United States were . . . left without adequate protection and security in their persons and property. The fourteenth amendment was adopted to remedy and correct this defect in the supreme organic law of the land.

[19] *See also Fiske v. Kansas*, 274 U.S. 380, 387 (1927) ("the act is an arbitrary and unreasonable exercise of the police power of the state, unwarrantably infringing the liberty of the defendant in violation of the due process clause of the 14th Amendment.").

The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. As this Court said in *United States v. Cruikshank*, 92 U.S. 542, 552, 23 L. Ed. 588: "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." . . . [T]he right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions,--principles which the Fourteenth Amendment embodies in the general terms of its due process clause.[20]

Freedom of religion required little discussion to be incorporated. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), held:

The fundamental concept of liberty embodied in that [Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws.[21]

The Fourth Amendment, which protects both substantive and procedural rights, was recognized as incorporated by *Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949),[22] as follows:

The security of one's privacy against arbitrary intrusion by the police--which is at the core of the Fourth Amendment--is basic to a free society. It is therefore implicit in "the concept of ordered liberty" and as such enforceable against the States through the Due Process Clause. The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned as inconsistent with the conception of human rights enshrined in the history and the basic constitutional documents of English-speaking peoples.

While most procedural guarantees of the Bill of Rights have been incorporated, the grand jury indictment clause has not.[23] *Hurtado v. California,* 110 U.S. 516, 532 (1884), explained that due process "must be held to guaranty, not particular forms of procedure, but the very substance of individual rights to life, liberty, and property." But in deciding the Sixth Amendment right to jury trial in a criminal case to be incorporated, *Duncan v. Louisiana*, 391 U.S. 145, 147-48 (1968), noted about the due process clause: "In resolving conflicting claims concerning the meaning of this

---

[20] As noted, *Cruikshank* made similar statements about the Second Amendment. 92 U.S. at 553.

[21] Accord, *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947) (establishment clause).

[22] *Overruled on other grounds*, *Mapp v. Ohio*, 367 U.S. 643 (1961).

[23] In addition, "The Court has not held that the right to jury trial in civil cases is an element of due process applicable to state courts through the Fourteenth Amendment." *Curtis v. Loether*, 415 U.S. 189, 192 n.6 (1974) (Seventh Amendment right where the value in controversy exceeds $20).

spacious language, the Court has looked increasingly to the Bill of Rights for guidance; many of the rights guaranteed by the first eight Amendments to the Constitution have been held to be protected against state action by the Due Process Clause of the Fourteenth Amendment."[24]

Substantive guarantees in the Bill of Rights are not subject to the question of whether a particular procedure is necessary for due process. In recognizing Bill of Rights guarantees to be incorporated, the Court relied on their status as such and did not purport to rely on evidence produced in discovery to determine if a constitutional right had enough importance or should really exist.[25]

The Second Amendment does not represent an inferior right which a court may subjectively relegate as beneath the usual rules of incorporation. "To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution." *Ullmann v. United States*, 350 U.S. 422, 428-29 (1956). No constitutional right is "less 'fundamental' than" others, and "we know of no principled basis on which to create a hierarchy of constitutional values. . . ." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982).

*Planned Parenthood v. Casey*, 505 U.S. 833, 848 (1992), explains that the Fourteenth Amendment protects specific Bill of Rights guarantees but is not limited to them:

> "[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on." (Citation omitted.)

In sum, since the Second Amendment encompasses an explicitly-guaranteed, substantive right, it meets the standards of the Supreme Court's jurisprudence on incorporation of fundamental rights into the Fourteenth Amendment. Accordingly, a state or local prohibition on possession of a handgun violates the right to keep and bear arms guaranteed by the Second and Fourteenth Amendments.

---

[24] *Accord Benton v. Maryland*, 395 U.S. 784, 794 (1969) (holding "that the double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage, and that it should apply to the States through the Fourteenth Amendment.").

[25] *See Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) (the right to petition for a redress of grievances is incorporated as "it has long been established that these First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States.").

## CONCLUSION

*Heller* directs the courts to "engage in the sort of Fourteenth Amendment inquiry required by our later cases." 128 S. Ct. at 2813 n.23. *Heller* and the inquiry it requires supersedes *Quilici v. Village of Morton Grove*, 695 F.2d 261,270 (7th Cir. 1982). As a matter of law, Oak Park's handgun ban violates the Second Amendment as incorporated into the Fourteenth Amendment. Accordingly, Count One of the Complaint states a claim on which relief may be granted and the Defense in the Answer that it does not should be overruled. Moreover, no discovery is relevant in regard to Count One.

This Court should issue an appropriate order embodying each of the above determinations and conclusions of law. In the alternative, should the Court find that the Second Amendment is not incorporated into the Fourteenth Amendment and dismiss Count I, Plaintiffs reserve all rights of appeal with respect to that dismissal.

Dated: December 1, 2008

Respectfully submitted,

**NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC., ROBERT KLEIN
ENGLER, and DR. GENE A. REISINGER**
Plaintiffs

BY:___ s/ William N. Howard_____
            One of Their Attorneys

Stephen P. Halbrook
Attorney at Law
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
Tel. (703) 352-7276
Fax (703) 359-0938

Local Counsel:
William N. Howard, Esq.
**FREEBORN & PETERS LLP**
311 S. Wacker Dr., Suite 3000
Chicago, Illinois 60606
Tel (312) 360-6415
Fax (312) 360-6573

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ROBERT KLEIN ENGLER, and DR. GENE A. REISINGER, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 08 C 3696 ) ) |
| VILLAGE OF OAK PARK and DAVID POPE, President, | ) ) ) ) |
| Defendants. | ) |

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he caused a true and correct copy of the foregoing

instrument to be served upon the parties of record, as shown below, via the Court's CM/ECF

filing system on the 1st day of **December 2008.**

Lance C. Malina
Jacob Henry Karaca
Klein, Thorpe & Jenkins, Ltd.
20 N. Wacker Dr., Suite 1660
Chicago, IL  60606-2903
Email:  lcmailina@ktjnet.com
        jhjaraca@ktjnet.com

s/  William N. Howard_____

Local Counsel:
William N. Howard, Esq.
**FREEBORN & PETERS LLP**
311 S. Wacker Dr., Suite 3000
Chicago, Illinois 60606
Tel (312) 360-6415
Fax (312) 360-6573

Stephen P. Halbrook
Attorney at Law
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
Tel. (703) 352-7276
Fax (703) 359-0938
(*Pro Hac Vice*)