IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 08 C 3696 |
| | ) | |
| VILLAGE OF OAK PARK, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 08 C 3697 |
| | ) | |
| THE CITY OF CHICAGO, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before these actions were brought, both the City of Chicago ("Chicago") and the Village of Oak Park ("Oak Park") had ordinances banning the ownership of handguns within their respective municipal boundaries. National Rifle Association ("NRA") filed companion lawsuits to invalidate the bans, arguing that they violated the United States Constitution's Second Amendment, as it was assertedly applicable to state governments and their progeny. NRA ultimately took its cases to the United States Supreme Court, where it along with Otis McDonald

(NRA was in the McDonald case as a party supporting the McDonald petition) convinced five Justices of their position (see McDonald v. City of Chicago, 130 S. Ct. 3020 (2010)).

Now NRA wants Chicago and Oak Park to pay its attorneys' fees under 42 U.S.C. §1988.[1] NRA has submitted a petition claiming $1,727,160.71 in fees and expenses for work in the Chicago and Oak Park cases combined, $142,109.60 for work done only in the Chicago case and $326,052.98 for work done only in the Oak Park case. Those figures cover multiple aspects of the cases: (1) litigation on the merits in this Court, our Court of Appeals and the Supreme Court; (2) litigation as to whether NRA was a prevailing party under Section 1988 in this Court and the Court of Appeals; and (3) litigation in this Court as to the amount of the fee.

NRA v. City of Chicago, 646 F.3d 992, 993-94 (7th Cir. 2011) determined that NRA is a prevailing party entitled to fees under Section 1988. So what remains to be determined is the amount of the fee award.

## Background on the Attorneys' Roles

NRA employed several law firms and lawyers during this litigation. During the merits phase of the cases Stephen Halbrook ("Halbrook") served as lead counsel in this Court and the Seventh Circuit in both lawsuits (N. Mem. 3).[2] William Howard ("Howard"), Daniel Dooley

---

[1] Further citations to statutory provisions in Title 42 will take the form "Section --."

[2] Citations to NRA's memorandum in support of its fee request will take the form "N. Mem. --"; citations to NRA's reply will take the form "N. Rep. --"; and citations to NRA's supplemental memorandum will take the form "N. Supp. --". NRA filed separate but identical memoranda in its cases against Oak Park and Chicago, so there is no need to distinguish between filings made in the two cases. Citations to Chicago's and Oak Park's joint memorandum will take the form "C. Mem. --." Many lawyers' declarations to support the fee petition are cited as "[Last Initial] Dec. --." NRA, Chicago and Oak Park submitted a Joint Statement pursuant to LR 54.3(e), and citations to that document will take the form "JS --."

("Dooley") and other attorneys from the Freeborn & Peters law firm ("Freeborn") served as local counsel in the Oak Park case (id.), while Stephen Kolodziej ("Kolodziej") of the Brenner, Ford, Monroe & Scott law firm ("Brenner") served as local counsel in the Chicago case (id.). Another law firm, Cooper & Kirk ("Cooper"), chipped in a few hours assisting Halbrook in the Seventh Circuit (N. Supp. 8).

Halbrook, with assistance from Cooper, then prepared a petition to the United States Supreme Court for a writ of certiorari (N. Rep. 6, N. Supp. 8). When the Supreme Court took the case, Stephen Poss ("Poss"), Kevin Martin ("Martin"), Joshua Lipshutz ("Lipshutz") and several other attorneys from the Goodwin Procter law firm ("Goodwin") took over briefing duties, with contributions from Halbrook and Cooper (N. Mem. 4). Paul Clement ("Clement") of King & Spalding ("King") handled the oral argument, with assistance from several other attorneys at his firm (id.).

Victors in the Supreme Court, NRA returned to this Court to seek fees. Halbrook and both sets of local counsel briefed whether NRA was a prevailing party (N. Supp. 9). When this Court ruled against NRA on technical grounds, Halbrook handled a successful appeal to the Seventh Circuit with assistance from Clement and other attorneys at his new firm, Bancroft (id.).

### Attorney's Fees

When a plaintiff prevails in an action to enforce Section 1983, Section 1988(b) entitles that plaintiff to collect its costs and a reasonable attorney's fee from the defendant. Gautreaux v. Chicago Housing Authority, 491 F.3d 649, 659 (7th Cir. 2007) is one of a great many cases that set out the initial step in determining the fee award:

In calculating reasonable attorneys' fees, the district court should first determine the lodestar amount by multiplying the reasonable number of hours worked by the market rate.

It is the party seeking the fee award that bears the burden of proving the market rate for each attorney and the reasonableness of the time spent by each. Before this opinion turns to an extended discussion of the first of those components (market rate), it is important to pause to understand why the preceding paragraph referred to determination of the lodestar figure as the "initial step" rather than as the necessarily conclusive amount, which it will be remembered is also a function of the second component (reasonable time spent).

Before the author of this opinion was privileged to join the federal judiciary, he spent a bit more than three decades as an active law firm practitioner, more than the last decade of that period as the firm's lead partner with principal responsibility for firm billing.[3] Both that experience and the home truths expressed in this opinion's later quotation from the Gusman case demonstrate the presumptive validity of the lodestar figure when work on a matter is done by a single lawyer. In that situation the market presumptively adjusts to produce a reasonable fee, for the lawyer's hourly rate presumably reflects the lawyer's efficiency and effectiveness (or lack of them) in producing the end product of his or her efforts.

That same analysis should hold true in situations in which more than one lawyer is involved, with each performing a discrete portion of the task. But the situation is very different where, as is so often the case these days (and as was true here), lawyers function in teams or their

---

[3] That was a time when the billing partner in a smaller firm could review each matter and the work done based on his or her personal familiarity with the matter and the work, rather than being confronted with the seeming inexorability of an automated computer-generated printout of time and money, the underpinnings of which were not known to the billing partner.

efforts overlap substantially. Lawyer A consults with Lawyer B, who then reviews Lawyer A's work, with Lawyer A then scrutinizing Lawyer B's input (and with more conferencing likely involved at those added stages of activity). In such situations the calculation of a number of lodestar figures (one for each lawyer), which are then simply added together, provides no assurance of generating a total figure that should be the subject of fee shifting.

More will be said on that subject later. But first this opinion turns to the possibility of placing a cap on fees, followed by a particularized review of the market rates for the numerous lawyers included in NRA's request.

**Chicago's and Oak Park's Proposed Cap on Fees**

Chicago and Oak Park propose capping NRA's recovery at the amount collected by plaintiffs in the McDonald action, the parallel lawsuit in which a different plaintiff also challenged Chicago's ordinance. There Chicago and McDonald agreed to a fee award of $399,950 (C. Mem. 20). NRA characterizes that as a settlement, suggesting that it is thus an unreliable barometer of the reasonableness of NRA's claim. Chicago and Oak Park respond that "technically there was no 'settlement' between McDonald and the City; McDonald submitted a fee petition pursuant to section 1988 which the City did not oppose" (id.). But Chicago and Oak Park apparently acknowledge that some negotiation took place over the amount of the fee.

Perdue v. Kenny A. ex rel. Winn, 130 S. Ct. 1662, 1672 (2010) teaches that "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." If $399,950 was enough to attract a capable attorney in McDonald, why not in these cases, which involved almost exactly the same issues and took the same path through the court system?

It would, however, be a mistake to assume that <u>McDonald</u> sets a ceiling on attorneys' fees for this case. <u>Gusman v. Unisys Corp.</u>, 986 F.2d 1146, 1150 (7th Cir. 1993) explains why:

> Lawyers do not come from cookie cutters. Some are fast studies and others require extra preparation. Some are more nimble on their feet and apt to achieve better results at trial. Some have deeper insight and in a few hours may find ways to prevail (or to curtail costly discovery) that will elude their colleagues. Clients are willing to pay more, per hour, for these better lawyers. A $225 per hour lawyer may end up costing less than a $150 lawyer for the same result or may produce better results for the same total bill. Markets recognize these truths; judges must too. Only an assumption that all lawyers are identical could support the averaging approach, under which all lawyers in a division of the court receive the same hourly fee.

McDonald's and NRA's attorneys are not identical (or fungible). What is more, they took different approaches to their respective cases: McDonald said that the Second Amendment applies to states by virtue of the Privileges and Immunities Clause of the Fourteenth Amendment, while NRA said it applied by virtue of the doctrine of substantive due process.

Perhaps McDonald's attorneys took a cheaper but more risky path. If that's so, then using the fees from that case as a ceiling may not attract capable counsel in future cases, unless those attorneys are also willing to gamble with a high-risk litigation strategy. This may not be accurate -- McDonald's attorneys may simply have been more efficient -- but it illustrates why it is preferable to begin by utilizing the lodestar approach, analyzing bills individually for reasonableness rather than placing a ceiling on the bills that assumes something demonstrably false: that all attorneys are the same.

**Stephen Halbrook's Rate**

As stated earlier, Halbrook served as lead counsel for NRA in this Court and the Seventh Circuit, prepared the petition to the Supreme Court for a writ of certiorari and participated to

some extent in the preparation at the Supreme Court level (H. Dec. 2-3).  Halbrook claims an

hourly rate of $800, clocked 1,632.8 hours on the case and seeks a total fee of $1,306,240 (JS 2).

Cases such as Uphoff v. Elegant Bath, Ltd., 176 F.3d 399, 407 (7th Cir. 1999) hold that a

lawyer's reasonable rate is whatever rate the market will bear for the lawyer's services.  NRA

says that Halbrook is entitled to $800 per hour because that is what is charged by a smattering of

other lawyers who have over 20 years of experience (as Halbrook does) and who practice

constitutional law.  But NRA cherry-picked its asserted comparators from among the

highest-charging lawyers in the country, looking exclusively at the rates of the experienced

Supreme Court litigators that it hired to brief and argue its appeal to the Supreme Court and the

rates of O'Melveny & Myers (another top law firm).

That poses an obvious problem.  Years of experience and field of practice are just two of

many determinants of the market rate.  Intelligence, skill, efficiency and a host of other factors

affect the rate that a lawyer can charge his or her clients.  Smarter, more skilled and more

efficient lawyers (or those who possess some though not all of those qualities or the congeries of

other qualities that make for better lawyering) can obviously command higher rates, even if other

attorneys have the same years of experience and practice in the same field.  It won't do to set

Halbrook's rate using only the top end of the group of lawyers as a proxy for his rate, when there

is no evidence that Halbrook is a member of that subset.

If Halbrook's skill set is really comparable to that of the attorneys from Goodwin Procter,

King & Spalding and Bancroft PLLC, why hire that horde of additional attorneys in the first

place?  True, Halbrook is a solo practioner and NRA's other law firms have resources that

Halbrook lacks, but by NRA's own account Goodwin Procter essentially took over briefing in the

Supreme Court, and Paul Clement handled the oral argument there (M. Dec. ¶6). NRA says that Halbrook brought a different skill set than its other lawyers. But if that's true, the other lawyers are poor comparators to Halbrook.

There is no justification for the use of proxies -- and poor ones at that -- for Halbrook's rate when much better data is available: What actual clients have paid to Halbrook is a far better measure of his market value. As for NRA itself, it pays Halbrook $225 per hour (H. Dec. 10). Halbrook says that rate is deeply discounted and that he works for NRA on a part-pro-bono basis (id.). He charges other clients rates between $400 and $500 per hour, but he says those rates are also discounted because he believes that vindication of Second Amendment rights should be affordable to all (id. 11).

Which rate is Halbrook entitled to: $800, $400-500 or $225? NRA says that when the prevailing party's lawyer performs services for discounted rates, the prevailing party ought to recover whatever fee the lawyer charges (or would charge) to his clients that pay full freight. NRA relies heavily on Barrow v. Falck, 977 F.2d 1100, 1105 (7th Cir. 1992):

> Some lawyers dedicate their professional lives to causes they find admirable and worthy of support – to legal services for the poor, to the representation of unions. These lawyers are making contributions to their favored causes, not in money but in time. Blum v. Stenson, 465 U.S. 886 (1984), holds that lawyers who donate their services at bargain rates to legal aid organizations may collect under § 1988 the fees they could obtain if the charitable element were removed. Likewise, Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516 (D.C.Cir.1988) (in banc), holds that lawyers who reduce their hourly rates when providing services to environmental plaintiffs may collect the market rate for the time – the rate that the solvent defendants would have paid for work of like quality. These cases, like our own opinion in Continental Illinois Securities, hold that the market rate of legal time is the opportunity cost of that time, the income foregone [sic – should be "forgone"] by representing this plaintiff. Using opportunity cost as the measure of legal services means that the value of the lawyer's gift inures to the favored cause, and not to the adversary in litigation.

- 8 -

Even so, a strong case can be made for applying a $225 hourly rate to Halbrook's time. This Court will credit his stated commitment to the cause that he and his client, NRA, pursued in this action. But no one suggests that NRA falls in the same category as legal aid organizations, environmental plaintiffs or even the mine run labor union in terms of funds available to pay its lawyers. Instead the common perception of NRA is that of an organization wealthy in financial terms as well as in supporters. If then Halbrook is sincere in his commitment to what he perceives as principle (and this Court does not question that), it is frankly difficult to see why he should be able to collect a windfall when it is someone else and not NRA that will end up paying the far higher bills.

But that said, a reasonable case can be made for evaluating Halbrook's services at the rates that he charges other clients. NRA says that Halbrook provided even those services at a discount, charging just $400-500, because he values defending Second Amendment rights. Halbrook says that he <u>could</u> charge $800 per hour if he really demanded it from his clients, but neither he nor NRA provided any evidence to support that purely speculative contention. For Halbrook to prove that the $400-500 range represented a discounted rate, he needed to present some evidence -- ideally evidence that an actual paying client accepted such a rate in those terms. Indeed, the thrust of the actual ruling in <u>Barrow</u>, 977 F.2d at 1105-06 supports a rate in that $400 to $500 most-commonly-charged range. Based on the evidence actually submitted by NRA (and the absence of other evidence), then, Halbrook's market rate will be placed at the midpoint of that range: $450 per hour (still a 100% "windfall" if his actual $225 rate is used as a benchmark).

**Market Rates of Other Attorneys**

Chicago and Oak Park say that the rates of Poss ($880 per hour) and Clement ($1,020 per hour) are excessive and ought to be reduced as well, because other Supreme Court litigators charge less. That is much the same stripe of argument that NRA has unsuccessfully advanced to justify Halbrook's claimed rate. Sauce for the goose is sauce for the gander: Chicago's and Oak Park's argument fails for the same reasons that NRA's did. Poss and Clement charge other paying clients those rates, and they actually charged those rates to NRA in this case. As In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992) admonishes:

> [I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his service in the market rather than being paid by court order.

Consumers of legal services are willing to pay those lawyers their respective hourly rates of $880 and $1,020, and NRA is entitled to recoup at those rates.

Chicago and Oak Park make the same objection to the rate of Freeborn & Peters, NRA's local counsel in the Oak Park case. That objection fails for the same reasons -- Freeborn & Peters provided evidence of their rates in other cases. NRA can recover at the rates listed in JS at 4.

Finally, Chicago and Oak Park object to the rate sought for NRA's local counsel in the Chicago case, Stephen Kolodziej. Kolodziej claims a per hour rate of $475, but he actually charged NRA $300 per hour. Kolodziej says he has no standard hourly rate but instead varies his rate depending on the nature and complexity of the case. Kolodziej presents an ambiguous statement to explain why NRA should collect more than $300 for the time he spent working in this instance (K. Supp. Dec. ¶3):

> Based upon the nature, complexity, and importance of the issues presented in this case of first impression, I charged the NRA a discounted rate of $300 per hour for my services. This rate was motivated by a desire to assist the NRA, which is supported by the hard-earned dollars of its members, in protecting the fundamental Second Amendment rights of the individual plaintiffs, NRA members, and Chicago residents generally.

Did the "nature, complexity, and importance" of this case dictate a rate of $300, or did it dictate something greater that Kolodziej later discounted? Kolodziej's first sentence indicates the former, while the second sentence indicates the latter. Rates actually charged to clients with cases that Kolodziej considered similar to NRA's would have been good evidence of Kolodziej's market rate for this case. Even a range of rates that Kolodziej charged would have been helpful. But Kolodziej has not provided such data in his declaration. Instead he states -- without providing any supporting evidence -- that lawyers in Chicago of his experience level generally charge $450-500 per hour to serve as local counsel.

Kolodziej does refer to a "Laffey Matrix," which shows prevailing rates for lawyers in the Washington D.C. area. That matrix has been endorsed as evidence of a lawyer's market rate by the D.C. Circuit, but other circuits have shown reluctance in applying the matrix to lawyers outside Washington D.C. (see, e.g., Pickett v. Sheridan Health Care Ctr., 664 F.3d 632, 649-50 (7th Cir. 2011), collecting cases). Pickett, id. observed that "[e]ven the D.C. Circuit has referred to the Matrix as 'crude' and has recommended that plaintiffs provide affidavits, surveys, and past fee awards to enable the district court to refine the Matrix for the particular attorney."

Kolodziej did provide a declaration (two, actually) that contains only a bare unsupported statement to support his claimed rate (K. Supp. Dec. ¶3):

- 11 -

> Based on my experience practicing in Chicago for 18 years, the market rate for attorneys with my level of experience handling a case of this nature in 2008-2011 was in the range of $450 to $500 per hour.

Kolodziej does not explain what he means by "level of experience" or "case of this nature." Nor does he explain how many other attorneys he has observed charging those rates and whether others charge different rates. Such an unsupported conclusory statement provides no reliable evidence of a reasonable billing rate for his work.

That failure is bad enough of itself, but Kolodziej's reliance on a purported proxy measure for his rate when real data is available is inexcusable. Kolodziej has actual paying clients. Even if he has no standard rate, the rates that he can impose on paying clients could provide support for a claim that he discounted <u>his</u> rate to the NRA -- support not provided by information as to rates charged by <u>different</u> lawyers to <u>different</u> clients.

In sum, Kolodziej's claim that he discounted his rate is unsupported by evidence -- evidence that he could have provided easily. NRA paid Kolodziej $300 per hour. That's the best evidence of his market rate for this kind of work, so that's the rate at which NRA can recover.

So much, then, for the hourly rates component of the lodestar approach. This opinion now shifts gears to look at the other component -- the "reasonable number of hours" to which those rates should be applied.

**Halbrook Hours**

NRA asks for compensation for 1,632.8 hours of Halbrook's time (JS 4). Oak Park and Chicago charge that is excessive because some of Halbrook's work was unnecessary or redundant of work performed by other attorneys.

- 12 -

Of course there is nothing wrong as such with having multiple lawyers work on a single case. As <u>Gautreaux</u>, 491 F.3d at 661(internal citations omitted) explains:

> Use of one or more lawyers is a common practice, primarily because it often results in a more efficient distribution of work. It allows more experienced, accomplished, and expensive attorneys to handle more complicated matters and less experienced, accomplished, and expensive counsel to handle less complicated ones.

But sticking too many attorneys into a case creates an obvious potential for waste (see, e.g., <u>Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.</u>, 574 F.3d 852, 858-59 (7th Cir. 2009)). For example, information is interchanged with greater difficulty in large teams, attorneys with conflicting ideas may go back-and-forth on drafts of briefs with little gain in quality and monitoring the team becomes more difficult, leading to duplication of work or wasted time on unimportant detours.

This Court's keen awareness of such risks, based on its long experience both as practitioner and as judge, led it to ask NRA's counsel to justify the size of its legal team, particularly in the Supreme Court, where three different law firms and roughly a dozen attorneys worked on the case.[4] For the most part NRA justified the role of each member of its legal team in the Supreme Court: Halbrook drafted the petition for certiorari with assistance from Cooper & Kirk, Goodwin Procter carried the laboring oar on the merits briefs and King & Spalding (Clement in particular) prepared for and handled the oral argument.

That explanation has not, however, justified Halbrook's role after the filing of the petition for certiorari. Halbrook billed something in the range of 500 hours during the merits

---

[4] In fairness to NRA, however, probably seven lawyers spent substantial time on the case, while others billed only a few stray hours.

briefing before the Supreme Court.[5]  But the affidavit of Martin, one of the Goodwin Procter

attorneys on the case, states that his firm took the lead in drafting the briefs:

> Our work included, <u>inter alia</u>, serving as Lead Counsel to the NRA in the United
> States Supreme Court, developing a briefing strategy for the NRA's opening brief
> as Respondent in Support of Petitioner; playing the lead role in writing the NRA's
> opening brief; coordinating with our client's [NRA's] in-house counsel as well as
> with co-counsel, experts, Petitioner and numerous amici in support of Petitioner;
> reviewing the Respondent's brief and the briefs of its dozens of amici; playing the
> lead role in writing the NRA's reply brief; and assisting in the preparation of
> co-counsel, Paul Clement, for oral argument.

In their role as lead counsel in the Supreme Court, attorneys from Goodwin Procter billed 318.5

hours <u>combined</u> (JS at 2).

NRA says nothing to justify the enormous outlay of hours by Halbrook, offering only a

vague explanation of his role (N. Supp. 6):

> Halbrook was the only counsel among the attorneys for the NRA plaintiffs, for the
> defendants, or from the fifty amici to have published widely on Second
> Amendment incorporation, to have litigated incorporation, and to have argued and
> won firearm law cases in the Supreme Court.

If Halbrook's role was indeed that of a consulting expert, rather than leader of the briefing team,

the expenditure of roughly 500 hours is extremely difficult (if not indeed impossible) to explain.

What is more, the billing records from the Goodwin Procter attorneys reflect only a few instances

of their consulting with Halbrook (M. Dec. Ex. B).  But an expert has value to a team of litigators

when he collaborates with them and contributes his expertise.  With a paucity of evidence in that

---

[5] This Court has not set about to determine exactly how many hours Halbrook billed after
filing the petition for certiorari and reply.  Halbrook billed 589.7 hours in the Supreme Court
phase of the litigation.  NRA's reply was filed on August 14, 2009, so any of Halbrook's hours
after that would be directed to the merits of the case.  Though this Court did not calculate the
time Halbrook spent on the petition for certiorari (work that is really for the lawyers to perform
in the first instance, to provide grist for this Court's mill), a quick eyeball estimate is roughly 100
hours.

respect, no real support for imposing the cost of his time on Chicago and Oak Park has been shown.

Halbrook's billing records include many entries for "legal research" without further explanation (H. Dec. Ex. B). Again there's no evidence that Halbrook shared that research with the rest of the team at the Supreme Court level. Indeed, one normally thinks of an expert as someone already well versed in a field. Given Halbrook's stated role as an expert in Second Amendment incorporation, it's hard to understand why he had to spend (and therefore bill for) so much time in research. In light of where the burden of proof is placed, the shifting of fees for that time must be rejected.

Halbrook's billing records also contain notations for "Preparation of Brief." But just how much time Halbrook spent in preparing the brief is a mystery, because he engaged in block billing: grouping multiple tasks into a single day's time entry. For example, on October 28, 2009 Halbrook billed 8.2 hours to "Legal Research; Preparation of Brief", but it's impossible to know how much time was allocated to each task. And Halbrook and NRA don't explain what "Preparation of Brief" means, be it drafting specific sections, reviewing and commenting on drafts or some other activity.[6] In all, the post-certiorari-petition portion of Halbrook's claim calls to mind the Stark v. PPM Am., Inc., 354 F.3d 666, 674 (7th Cir. 2004) holding that "[h]ours spent are not reasonably expended if they are excessive, redundant, or otherwise unnecessary." Most, if

_____

[6] When such billing practices are engaged in solely between lawyer and client, of course they pose no problem (in ancient days this Court's law firm, after the careful vetting by the billing partner described earlier, would most typically render a bill that read simply "To legal services rendered" and would state the amount billed -- and the bills were just as simply paid without question). But when the possibility of recoupment is known from the outset, as is the situation with Section 1983 litigation, more particularization is really called for.

not all, of Halbrook's hours in the Supreme Court appear to be excessive and redundant. To the extent that is not true, NRA has failed to submit evidence that allows this Court to distinguish the reasonable from the unreasonable. Accordingly NRA will not be awarded fees for Halbrook's time entries from August 15, 2009 through June 28, 2010 (H. Dec. 15-20).

**Cooper's Hours**

Chicago and Oak Park object to the entire fee request from Cooper as redundant of the work of other counsel. Lawyers from Cooper spent roughly 70 hours on this case: just over 8 in assisting Halbrook in the Seventh Circuit, 22 hours in assisting Halbrook on the petition for certiorari, almost 14 hours on the briefs and argument before the Supreme Court and 27 hours in preparing a declaration for the fee petition. For the most part Cooper's work amounted to reviewing draft briefs and providing comments, though roughly seven hours in the Supreme Court phase were spent assisting attorney Clement with a moot court. Charles v. Daley, 846 F.2d 1057, 1075 (7th Cir. 1988) holds that district courts are entitled to limit fees for excessive review and re-review of drafts. But a few hours billed for one attorney's single review is hardly excessive. Cooper's hours are reasonable.

**Local Counsel's Hours**

NRA hired one firm (Freeborn) to serve as local counsel in the Oak Park case and another (Brenner) to serve as local counsel in the Chicago case. NRA says the latter involvement was necessary because its first choice, Freeborn, had a potential conflict in working against Chicago. Freeborn approached Chicago about waiving the conflict, but Chicago refused. So NRA hired Freeborn as local counsel in the Oak Park case and Brenner as local counsel in the Chicago case. NRA says that neither firm duplicated the other's work, because "[w]hen otherwise similar

research was needed or identical documents had to be prepared, Howard's firm [Freeborn] usually provided the service and Kolodziej [from Brenner] simply followed the same course or copied the pertinent document" (P. Supp. M. 7). That of course is no way to take an end run around a conflict of interest -- working against an adversary under the cloak of another firm is no better than openly doing so. But Chicago seems not to have objected to that arrangement.

NRA's cases against the two municipalities were consolidated in the Seventh Circuit, but both Freeborn and Brenner continued to bill work after the consolidation. This Court's review of the two firms' bills reveals that many tasks were divided between the two firms, with Freeborn taking on most of the substantive work. But undoubtedly that arrangement created waste. Local counsel generally serve their clients by providing lead counsel with advice on location-specific practices, by providing substantive input from a practitioner more familiar with a local judge's views and by completing the mechanical aspects of filings in the courts. Having two sets of attorneys review every piece of correspondence and filing is an unreasonable indulgence. Conferences to divide tasks between the two sets of local counsel are another source of waste.

Ideally Freeborn and Brenner would have presented revised billing statements in which one firm struck out entries involving review of documents that the other had also reviewed. They would also have stricken phone conferences and e-mail correspondence used to divide tasks between the two firms. That may now be impossible.

Brenner's billing statements contain very little detail. For example, entries on April 20, 2009 read (K. Dec. Ex. A, 49):

> Receipt and review of correspondence from attorney Howard
> Receipt and review of correspondence from attorneys Halbrook and Conte

Brenner styles many other entries the same way. Such entries make it impossible to determine whether the attorneys were performing a unique task or an overlapping or wasteful one. Freeborn, to its credit, provided much more informative billing entries, but a line-by-line comparison of its bills with Brenner's is both time-consuming and ultimately useless, given the lack of detail in Brenner's bills. NRA thus failed to meet its burden of establishing the reasonableness of the hours spent by both local counsel in the Seventh Circuit. Because Freeborn was NRA's local counsel of choice and admittedly the primary local counsel, NRA will receive compensation only for Freeborn's fees during the time the cases were consolidated.

**Other Miscellaneous Objections**

Oak Park and Chicago raise several other objections to NRA's fee request. None of those objections has merit, and so this opinion will address them only briefly.

Oak Park and Chicago object to work that NRA's lawyers performed on unsuccessful or inconsequential motions (C. Mem. 9). Courts regularly award fees for lost battles fought in an ultimately successful war effort. Jaffee v. Redmond, 142 F.3d 409, 414 (7th Cir. 1998) explains why:

> Accordingly, just as Hensley [v. Eckerhart, 461 U.S. 424 (1983)] dictates that fees incurred on unsuccessful but related claims may be compensable, we have recognized that courts may award fees for time reasonably spent on an unsuccessful argument in support of a successful claim. As we noted in People Who Care v. Rockford Board of Education, 90 F.3d 1307, 1314 (7th Cir.1996), the touchstone in such a case is not whether a particular argument was successful, but rather whether it was reasonable. See also Cabrales v. County of Los Angeles, 935 F.2d 1050, 1053 (9th Cir.1991) ("If a plaintiff ultimately wins on a particular claim, she is entitled to all attorney's fees reasonably expended in pursuing that claim-even though she may have suffered some adverse rulings.").

NRA has explained the strategic purpose behind its unsuccessful motion practice (N. Mem. 7). Hours expended on those efforts were reasonable and will not be excluded from the fee award.

Oak Park and Chicago also object to the legal research expenses sought by Freeborn, because these expenses are derived from what the municipalities think was unnecessary work. But as previously noted, Freeborn's work was reasonable, so its associated expenses for legal research are also reasonable.

Oak Park and Chicago next object to Clement's involvement in NRA's efforts to convince this Court and the Seventh Circuit that it was a prevailing party under Section 1988. NRA cogently explained Clement's expertise and role in that stage of the case, and Clement's firm devoted just 35 hours to that part of the case. That limited involvement is reasonable.

Finally, Oak Park and Chicago say that it was unreasonable for Halbrook to spend time litigating the fee amount after the fee petition was filed. NRA, however, was entitled to respond to Chicago's and Oak Park's objections to the fee petition.

## Conclusion

As discussed earlier, a case in which many different law firms and lawyers participate raises concerns of wasted time. If time is wasted -- through different lawyers performing the same task, or through overlong communications between lawyers, or otherwise -- the use of the lodestar method coupled with simple addition of the figures for each lawyer no longer produces a reasonable fee.

This Court previously called for additional briefing from NRA to explain whether its attorneys' hours were wasted in that way. And this opinion has already found that Halbrook's hours in the Supreme Court were unnecessary and that the use of two sets of local counsel was at

times unnecessary. But Chicago and Oak Park have noted only generally that some additional work has been unnecessary, and they have not pointed to specific billing references that show redundancy or other wasteful lawyer activity.

Although it thus seems most likely that this opinion has not made all of the adjustments that an in-depth scrutiny of the voluminous billing records of NRA's numerous counsel might reveal (and, indeed, although such possible further adjustments could be substantial in amount), it is not this Court's appropriate role to delve into matters not teed up by the litigants for its consideration. As Judge Posner has said for the Court of Appeals in a different context, "Judges are not like pigs hunting for truffles" (United States v. Dunkel, 929 F.2d 955, 956 (7th Cir. 1991)).

But a like caution against any revisionist submissions must go to NRA as well. This Court will not entertain any effort on its part to cure the flaws, or to close the gaps, in its earlier submissions that this opinion has revealed. Each side had -- and exercised -- more than an ample opportunity to present its case in the best light, and this opinion has placed these cases in a posture equivalent to that of a case that has gone to trial and verdict, with some post-verdict input (such as a calculation of pre-judgment interest on a money judgment) being needed to quantify the amount of the judgment. In the same way, the finality of the rulings here is not altered by the fact that the final calculation must be submitted and then made in conformity with this opinion.

Accordingly, this Court awards NRA the fees it demands, except that:

1.      Halbrook's billing rate is reduced to $450 per hour.

2.      Kolodziej's billing rate is reduced to $300 per hour.

3.    Halbrook may not claim fees for work performed from August 15, 2009 through June 28, 2010.

4.    Brenner may not claim fees for work performed during the time the cases were consolidated.

NRA is ordered to submit its recalculation of its total fees in conformity with this opinion on or before July 12, 2012. NRA shall accompany that submission with copies of Halbrook's and Brenner's billing statements with the stricken time entries crossed-out or otherwise noted. Chicago and Oak Park will then be allowed 14 days to review NRA's recalculated figure and submit any objections.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 25, 2012.

- 21 -